UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| XLINK RESOURCE GROUP, LLC. | § § § | |
| **Plaintiff,** | § § | |
| v. | § § § | CIVIL CAUSE NO. 4:24-cv-35 |
| EXPO PETROLEUM OIL AND GAS USA, LLC; MAYOMI OLOOTU; JAMES UDUAK UBOM; ARCHER TACTICAL GROUP; ARCHER ENERGY CORPORATION; DAVID TOLLAKSEN; and JIM TRICE | § § § § § § § § | |
| **Defendants.** | § § | |

## ORIGINAL COMPLAINT

NOW COMES Xlink Resource Group, LLC (the "Plaintiff"), and files this Original Complaint for civil violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1964(c) and (d)) ("RICO"), fraud, and civil conspiracy to commit fraud against (i) Expo Petroleum Oil and Gas USA. LLC ("Expo"); (ii) Mayomi Olootu ("Olootu"); (iii) James Uduak Ubom ("Ubom"); (iv) Archer Tactical Group; (v) Archer Energy Corporation; (vi) David Tollaksen, and (vii) Jim Trice ("Trice") (collectively, parties (i) through (vii) represent the "Defendants"). Predicate acts giving rise to the RICO claims include (i) theft from interstate shipment in violation of 18 U.S.C. § 659; (ii) fraud and related activity in connection with identification documents in violation of 18 U.S.C. § 1028; (iii) laundering of monetary instruments in violation of 18 U.S.C. § 1956; (iv) mail fraud in violation of 18 U.S.C. § 1341; and (v) wire fraud in violation of 18 U.S.C. § 1343. In support thereof, Plaintiff states as follows:

### I.  SHORT SUMMARY

1. Defendants collectively orchestrated an elaborate, multi-year scheme to defraud that involved the use of counterfeit authorization of the Nigerian National Petroleum Corporation, and a web of complicit conspirators who impersonated businesses and falsely purported to have authority to sell two million barrels of oil.  Through their collective efforts, the Defendants defrauded Plaintiff of nearly $700,000 in cash deposits, and caused thousands of dollars of legal and travel expenses and millions of dollars in lost revenues.  The Defendants' fraud involved the creation and transmission of fraudulent contract documents, inspection reports, and invoices.

2. The Defendants conspired to defraud Plaintiff.  Plaintiff believed, in good faith, it was acting as an intermediary on behalf of a buyer in an international oil and gas transaction.  Defendants collectively encouraged, engaged in, and bolstered the fraudulent transaction and ultimately stole nearly $700,000 from Plaintiff under the guise of "transaction deposits" and "testing fees."  Plaintiff was also forced to expend approximately $56,348.00 in travel and legal expenses attempting to gather information and recoup his funds.

3. In 2020, Defendant Expo and its CEO, Defendant Olootu, purported to act as a seller's representative for the Nigerian National Petroleum Corporation.  Through the use of patently false statements and the production of counterfeit documents, Expo and the other Defendants conspired to, and in fact did, create the appearance of a legitimate oil and gas transaction, ultimately inducing Plaintiff to wire nearly $700,000 to Defendant Expo, Defendant Ubom, and another corporation, BCS Nederland.

### II.  JURISDICTION & VENUE

4. This Court has subject matter jurisdiction over this action under 18 U.S.C. § 1964.  This Court has original subject-matter jurisdiction under 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331 because it presents a question arising under the laws of the United States.  28 U.S.C. §§ 1331 and 1337.

Specifically, this action arises, in part, under the Federal Racketeer Influenced and Corrupt Organizations Act ("Federal RICO").

5. Additionally, this Court also has supplemental jurisdiction over all other claims in this matter under 28 U.S.C. § 1367(a). All claims for which the district courts do not have original jurisdiction are so related to the claims for which it does have original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

6. Venue is proper in this judicial district under 28 U.S.C. § 1391, as Defendants are subject to personal jurisdiction in this judicial district under 18 U.S.C. § 1965 and process may be served "in any district of the United States."

7. The following facts give rise to personal jurisdiction over the Defendants in this matter:

   a. During the relevant period, and through the date of the filing of this Complaint, Defendant Olootu resided in Allen, Texas.

   b. During the relevant period, Plaintiff acted as a broker in the transactions at issue to persons who resided in Texas and were engaged in business in Texas.

   c. Several of the in-person meetings with respect to the transactions at issue took place in Dallas, Texas and Houston, Texas.

   d. Multiple wire transfers at issue were sent to and/or received from a bank located in Allen, Texas or McKinney, Texas.

8. Additionally, venue is proper under 28 U.S.C. § 1965(b) because in any action brought under the Federal RICO statute in a U.S. District Court, the Court may cause parties residing in another district to be summoned to that district if the "ends of justice require" it. Here, the ends of justice require this Court's exercise of personal jurisdiction over all Defendants.

9. Along with the acts alleged in this Complaint, the Defendants directly or indirectly used the means and instrumentalities of interstate commerce and the United States mail.

10. Defendants operated an enterprise within the meaning of 18 U.S.C. §1961(4) that operates in interstate commerce and the activities of which affect interstate commerce.

### III. PARTIES

11. Plaintiff, Xlink Resource Group LLC, is a limited liability company formed in the State of Wyoming.

12. Defendant, Expo Petroleum Oil and Gas USA LLC, is a limited liability company formed in the State of Texas and can be reached for service of process at 401 Century Parkway, #1773, Allen, Texas 75013.

13. Defendant, Mayomi Olootu, is an individual who resides in the State of Texas and can be reached for service of process at either 315 N. Greenville Avenue, Apt. 821, Allen, Texas 75002 or 7304 Crystal Brook Drive, Austin, Texas 78724.

14. Defendant, James Uduak Ubom, is an individual who resides in Washington D.C. and/or the State of Maryland and can be reached for service of process at 12324 Needlepine Ter., Silver Spring, Maryland 20904 or 7800 Georgia Avenue NW, Washington D.C. 20011.

15. Defendant, Archer Energy Corporation, is a limited liability company formed in the State of Virginia and can be reached for service of process at 4445 Corporation Lane, Suite 264, Virginia Beach, Virginia 23462.

16. Defendant, Archer Tactical Group, is a limited liability company formed in the State of Virginia and can be reached for service of process at 150 Boush Street, Suite 601, Norfolk, Virginia 23510.

17. Defendant, David Tollaksen, is an individual who resides in the State of Virginia and can be reached for service of process at 528 Wickwood Drive, Chesapeake, Virginia 23322.

18. Defendant, Jim Trice, is an individual who resides in the State of Florida and can be reached for service of process at 3049 Prestige Drive, Clearwater, Florida 33759.

## IV.  FACTS

### The Formation of Xlink

19. On June 19, 2019, Tim Thompson and his business partner, John Reed, formed Xlink as a Wyoming limited liability company.  Xlink sought to engage in large-scale oil and gas transactions.

20. On November 18, 2019, Mr. Thompson was introduced to Jim Trice, the Chief Executive Officer of Archer Energy Corporation, and David Tollaksen, the Chief Executive Officer of the related Archer Tactical Group.  The meeting took place in The Woodlands, Texas.

21. On December 10, 2020, Trice and Tollaksen introduced Mr. Thompson to Mayomi Olootu, the Chief Executive Officer of Expo Petroleum Oil and Gas USA.  The introduction took place over the telephone while Mr. Thompson was visiting LaBelle, Florida on business.

22. During their discussions, Olootu represented Expo as a seller's representative for Nigerian National Petroleum Corporation ("NNPC").  Trice and Tollaksen were instrumental in establishing Olootu's legitimacy.  Additionally, Olootu further legitimized his status as a representative for NNPC using the following tactics:

   a. Olootu provided Mr. Thompson documents from prior oil and gas transactions involving NNPC to legitimatize this status, including (i) a Letter of Authorization dated January 15, 2019, and (ii) a "Provisional Lifting Right" dated April 20, 2020.

   b. Beginning on September 21, 2020, Olootu and Mr. Thompson engaged in several phone calls with Boyd Chisholm, who was in Nigeria at the time.  Chisholm acted as an on-the-ground agent and, during these calls, confirmed several details regarding the relationship between Expo and NNPC.  Mr. Thompson was located in various states at the time of these calls, including Texas, Florida, Arkansas, and Tennessee.

23. Under the belief that it had legitimate contacts with NNPC to engage in oil transactions, Xlink sought potential buyers to represent in those transactions.

### The Initial Transaction – Mega Source Trading

24. Ultimately, Xlink located Mega Source Trading, Inc. ("Mega Source") as a potential buyer.

25. On November 20, 2020, Mega Source sent a signed Letter of Intent to, among others, NNPC, Xlink, and Archer Energy, indicating its intent purchase up to two million barrels of oil.

26. During late November and early December 2020, the parties to the oil transaction (Mega Source, Xlink, Expo, and NNPC) began circulating the following documents via e-mail for review and edit:

   a. Draft Sales and Purchase Agreement and Tanker-Take-Over Procedures;

   b. Paymaster/Escrow Agreement; and

   c. Memorandum of Understanding.

27. On December 14, 2020, Mega Source received a letter via e-mail, purported to be from NNPC, confirming the availability of two million barrels of bonny light crude oil at the Shell Europoort Terminal in Rotterdam, Netherlands.

### The First Payment

28. On January 18, 2021, Olootu issued an invoice to Mega Source via e-mail requiring a $200,000 deposit on the oil transaction.

29. In late January 2021, due to disagreements with regard to the timing of the requested deposit payment and Mega Source's ability to verify oil samples, Mega Source abandoned the transaction.

30. During the following period, Mr. Thompson began to receive indirect threats from David Tollaksen with respect to the transaction. On February 1, 2021, Mr. Thompson received an e-mail from Tollaksen stating "you can go f*** yourself." Tollaksen signed the e-mail "your god."

31. On February 22, 2021, Xlink received an e-mail containing a letter, purported to be from NNPC, stating that in order to continue with the transaction, Xlink would be required to pay $1,455,000 to become an "authorized vendor" under NNPC's new "in-house crude sales" program

(*i.e.*, the eWallet program).  The first installment of $200,000 would be due in order to register for the program.

32. On February 26, 2021, Xlink sent the first payment of $200,000.00 via wire transfer to Expo in order to receive authority to verify oil samples in an effort to proceed with the oil inspection.  Xlink sent the wire transfer from a Wells Fargo bank located in Marina Del Rey, California to a Chase Bank located in Allen, Texas, as Xlink sought to present the inspection results to a qualified replacement buyer.

33. During early-to-mid-2021, Xlink experienced several delays due to the NNPC.  Xlink was informed the delays were the result of an effort to restructure NNPC from a state-owned entity to a private entity.  The reorganization involved the development and implementation of a new verification repository, known as an "eWallet," which was a cloud-based storage system to which documents could be uploaded and independently reviewed and verified.

### BergTrust BV Enters as Buyer

34. In late June 2021, Xlink engaged a replacement buyer, BergTrust BV.

35. On June 24, 2021, Olootu notified Xlink via e-mail that future payments to NNPC would not be sent to Expo directly, but would instead be sent to Expo's escrow agent, Ubom Law Group. Olootu provided Ubom's IOLTA account information.

### Collecting Oil Samples

36. On July 1, 2021, Xlink received a letter via e-mail, purported to be from NNPC, indicating they would issue a letter authorizing the collection of oil samples by July 15, 2021.

37. On July 28, 2021, following further delays on its part, Xlink received a follow-up letter, again purported to be from NNPC, laying out the following procedure for collecting and testing oil samples:

    a. NNPC would issue an "Authority to Verify," which would grant a specific designated agent the authority to collect and test samples;

    b. The designated agent would be granted access to specified tanks to collect samples;

    c. The samples would be tested, and the inspection report would be submitted to NNPC; and

    d. NNPC would issue an invoice for the testing fee.

### Xlink Introduced to BCS Nederland

38. In anticipation of the Authority to Verify, Xlink sought an agent to perform the collection and testing of oil samples. Xlink contacted several parties in connection with these services, but was unable to procure the services for, at the time, unknown reasons.

39. On or around May 22, 2021, a broker that Xlink had previously had discussions with, Matt Jameson, encouraged Xlink to meet with a group called BCS Nederland.

40. Shortly thereafter, Xlink met with two representatives for BCS Nederland, Rene Troost and Frank Bruijstens, via telephone to negotiate the collection and testing services. Once an agreement was made, Xlink notified NNPC of the inspection agent. On July 29, 2021, BCS Nederland sent Xlink a "proforma invoice" that included wiring instructions for any testing payments.

41. Despite providing this information, Xlink did not receive an Authority to Verify from NNPC for several months.

42. In September 2021, in response to a request that was purportedly from NNPC, Xlink provided an updated Memorandum of Understanding between Xlink and Bergtrust BV.

43. On September 24, 2021, Xlink received the following letters, purported to be from NNPC, via e-mail:

    a. A letter confirming NNPC's commitment to release 2,000,000 barrels of oil in connection with the Memorandum of Understanding; and

    b. A letter confirming the availability of said barrels.

### Sales and Purchase Agreement

44. On October 3, 2021, Xlink, BergTrust BV, and Expo entered into a Sales and Purchase Agreement.  A copy of the agreement was sent to NNPC in an effort to obtain a newly issued Authority to Verify.

45. On October 8, 2021, Xlink received an e-mail containing the "Authority to Verify," purported to be from NNPC, for Rene Troost and Frank Bruijstens, directed to Tank Nos. 3032, 3034, 3039 and 3040.

46. The Authority to Verify noted that Xlink would need to contact one of two Shell PLC representatives to arrange for the sampling: the "Tank Farm Supervisor," Marjolein Van Breukelen, or the "Tank Farm Manager," Jeffrey Van De Velde.  Although Xlink had significant difficulty contacting these two individuals, they were reassured by both Bruijstens and Troost that this was normal.  Bruijstens and Troost offered to contact Mr. Van De Velde and coordinate the inspection, and purportedly did so.

47. In early October 2021, BCS Nederland collected the samples from the specified tanks.  The collection was coordinated with Jeffrey Van De Velde and Marjolein Brukeilen as representatives of Shell PLC at the Europoort terminal.  BCS Nederland brought the samples to Camin Cargo for testing.  On October 11, 2021, BCS Nederland issued its inspection report via e-mail.

### The Second, Third, and Fourth Payments

48. Xlink submitted two payments via wire transfer, totaling $83,081.40, to BCS Nederland for the collection of samples and the testing of those samples.  The payments were made in accordance with the wiring information on the July 29, 2021 proforma invoice:

    a.  The first payment of $53,156.40 was submitted on September 29, 2021; and

    b. The second payment of $29,925.00 was submitted on October 12, 2021. This payment was wired from a Wells Fargo Bank located in McKinney, Texas to a bank located in Amsterdam, Netherlands.

49. On October 12, 2021, Expo sent a Commercial Invoice to BergTrust BV via e-mail for the full amount of the oil purchase, $163,744,217.20.

50. On October 14, 2021, Xlink sent the $200,000 installment payment via wire transfer for registration in the eWallet program to Ubom Law Group's IOLTA account.

### BergTrust BV Drops Out and Global Enterprise Solutions Enters the Transaction

51. Meanwhile, BergTrust BV had not made payment on the Expo invoice. In a letter dated October 20, 2021, BergTrust BV noted they were having issues contacting the Shell Europoort Terminal operators, Marjolein Van Bruekelen and Jeffrey Van De Velde, to verify the oil.

52. Ultimately, BergTrust BV dropped out of the transaction entirely for unrelated reasons.

53. Following the departure of BergTrust BV, Xlink sought another replacement buyer. Eventually, Xlink connected with Global Enterprise Solutions ("GES").

### The Fifth and Sixth Payments

54. While Xlink was in discussions with GES regarding the oil transaction, Olootu informed Xlink that NNPC would require an additional $200,000 deposit to preserve the oil. As a result, and in accordance with Olootu's June 24, 2021, instructions, Xlink made the following wire transfers to Ubom Law Group's IOLTA account:

    a. A payment of $89,000 was submitted to Ubom Law Group's IOLTA account on December 20, 2021, via wire transfer; and

    b. A payment of $111,000 was submitted to Ubom Law Group's IOLTA account on February 1, 2022, via wire transfer.

55. In March 2022, Xlink issued a "corporate offer" to GES for 2,000,000 barrels of oil.

56. On March 29, 2022, in response to the arrangement with GES, Xlink received a new Authority to Verify, purported to be from NNPC, for Rene Troost and Frank Bruijstens via e-mail, directed to Tank Nos. 3040, 3044, and 3045.

### The Seventh Payment

57. On April 6, 2022, Xlink submitted a payment of $14,093.75 to BCS Nederland via wire transfer for the collection of samples.   However, as part of their agreement, Xlink was only responsible for the cost of collecting samples, while GES was responsible for the cost of analyzing the samples.

58. In early April 2022, BCS Nederland collected the samples from the Shell Europoort terminal in the same manner as the previous collection, that is, with the coordination and assistance of Shell PLC representatives Jeffrey Van De Velde and Marjolein Brukeilen.

59. After collection, the samples were sent to AmSpec Group for testing, at the request of GES.

### Xlink Discovers the Fraud

60. On April 9, 2022, rather than receiving an inspection report, Xlink received a phone call from James MacArthur, the branch manager of AmSpec B.V.  MacArthur notified Xlink that AmSpec would not analyze the samples because (i) Shell PLC informed him the samples did not come from their tanks, and (ii) the samples were illegally obtained via "rundown tanks" rather than storage tanks.

61. Following this phone call, Xlink became aware of the following information:

   a. The reason it was unable to locate a testing agent prior to being directed to BCS Nederland was due to status of the subject tanks as "rundown tanks."

   b. Jeffrey Van De Velde and Marjolein Brukeilen, acting as agents on behalf of Shell PLC, coordinated and escorted the fraudulent dip test by BCS Nederland.  They permitted entrance to the facility, access to the rundown tanks, and collection of samples.

   c. The entire oil and gas transaction was a long-running, and intricate, scam operation involving several groups of interconnected individuals and entities.

62. On April 12, 2022, Mr. Thompson traveled to Washington, D.C. in an effort to get information from Ubom Law Group, the escrow agent for Expo (and, indirectly, NNPC), regarding the whereabouts of its funds.  Mr. Thompson remained in Washington, D.C., until the morning of April 14, 2022.

63. During Mr. Thompson's visit, Defendant Ubom refused to comply with Thompson's repeated requests for information.

64. On April 29, 2022, Mr. Thompson received notice that Ubom had filed for a protective order against him.

65. On May 24, 2022, Mr. Thompson appeared at a scheduled hearing on the protective order at the District Court of Maryland for Montgomery County.  The protective order was deemed baseless by the court and was summarily dismissed in its entirety.

66. Following its discovery of the fraud in April 2022, Xlink also sought recourse from Shell PLC with respect to the blatantly illegal activities undertaken by its representatives, Jeffrey Van De Velde and Marjolein Brukeilen.  Shell PLC ignored Xlink's requests for information and allegations of fraud and took no action to resolve or even investigate this matter.

67. On June 30, 2022, Olootu sent a receipt, purported to be from NNPC, evidencing the payment of $600,000.00 for "dip-test pre-logistics."

68. During a phone call in July 2022, David Tollaksen issued a direct physical threat to both Defendant Olootu and Mr. Thompson, stating he would send "some guys" to "get [them] straight" on the transaction.

69. Over the course of the fraudulent scheme, Xlink made seven payments totaling $697,175.15 to various complicit parties:

    a.  A payment of $200,000.00 was sent to Expo on February 26, 2021;

    b.  A payment of $53,156.40 was sent to BCS Nederland on September 29, 2021;

  c. A payment of $29,925.00 was sent to BCS Nederland on October 12, 2021;

  d. A payment of $200,000.00 was sent to Ubom Law Group on October 14, 2021;

  e. A payment of $89,000.00 was sent to Ubom Law Group on December 20, 2021;

  f. A payment of $111,000.00 was sent to Ubom Law Group on February 1, 2022; and

  g. A payment of $14,093.75 was sent to BCS Nederland on April 6, 2022.

70. Additionally, Xlink incurred travel and legal expenses of approximately $56,348.00 in its attempts to gather information regarding the fraudulent transaction and to recoup its lost funds.

71. Xlink also lost actual revenue of $940,000.00 due to its inability to accept other contracts resulting from its allocation of time and resources to the fraudulent scheme, as well as approximately $180,000,000.00 in projected revenue related to the fraudulent scheme.

## V. CLAIMS

### Count I: Violations of 18 U.S.C. § 1962(c) (Civil RICO)
### (All Defendants)

72. Plaintiff realleges paragraphs 1-71 as if set forth fully herein.

73. All Defendants violated 18 U.S.C. § 1962(c), injuring Plaintiff and giving rise to liability under 18 U.S.C. § 1964(c).

74. Under 18 U.S.C. § 1964(c):

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final.

75. 18 U.S.C. § 1962(c) provides as follows:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct

or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

76. Defendants are each a "person" within the meaning of 18 U.S.C. § 1961(3).

77. The Defendants together form an association-in-fact (along with being separate legal enterprises) for the common and continuing purpose of fraudulently transferring the assets out of the reach of Plaintiff. This constitutes an enterprise within the meaning of 18 U.S.C. § 1961(4). The members of the enterprise functioned as a continuing unit with an ascertainable structure separate and distinct from that of the culpable individuals. The Defendants, together, directed the enterprise by fraudulently facilitating the payment of nearly $700,000 by Plaintiff, in addition to other fraudulent acts meant to conceal the illegal activity, such as the creation and transmission of fraudulent documents.

78. The enterprise engaged in and affected interstate commerce. Plaintiff Xlink Resource Group LLC is a legal entity formed under the laws of the State of Wyoming and with its principal office based in Wyoming. Defendants utilized e-mail and other forms of correspondence, in addition to wiring funds, across state and international lines.

79. The Defendants, each a distinct person associated with the enterprise, did conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c).

80. Predicate acts of racketeering activity are acts that are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(B), as more specifically alleged above and below. The Defendants committed at least two such acts or aided and abetted the acts committed by other members of the enterprise.

81. Specifically, the Defendants committed the following indictable acts:

   a. Defendants committed theft of oil samples from a tank storage facility with intent to convert the same to their own use as part of an interstate shipment. Defendants

  committed acts constituting indictable offenses under 18 U.S.C. § 659 (theft from interstate shipment).

 b. Defendants committed laundering of monetary instruments on multiple occasions by transporting, transmitting, or transferring monetary funds from a place in the United States to or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity.  Defendants committed acts constituting indictable offenses under 18 U.S.C. § 1956(a)(2)(A) (laundering of monetary instruments).

 c. Defendants committed identification fraud on multiple occasions by knowingly providing false identification documents and information in furtherance of the fraudulent scheme.  Defendants committed acts constituting indictable offenses under 18 U.S.C. § 1028(a) (fraud and related activity in connection with identification documents, authentication features, and information).

 d. Defendants committed mail fraud on multiple occasions by facilitating fraudulent transfers of funds from Plaintiff through the use of mail communications.  Defendants committed acts constituting indictable offenses under 18 U.S.C. § 1341 (mail fraud).

 e. Defendants committed wire fraud on multiple occasions by facilitating fraudulent transfers of funds from Plaintiff. Defendants committed acts constituting indictable offenses under 18 U.S.C. § 1343 (wire fraud).

82. Defendants also committed acts constituting the aiding and abetting of offenses under 18 U.S.C. §§ 1956 (laundering of monetary instruments), 1028 (fraud and related activity in connection with identification documents), 659 (theft from interstate shipment), 1343 (wire fraud), and 1341 (mail fraud).

83. The acts of racketeering were not isolated. Rather, they were related in that they had the same or similar purpose and result, participants, victims, and method of commission. Further, the acts of racketeering by the Defendants were continuous, with repeated conduct during a period beginning at least as early as November 2020 and continuing to April 2022. There is a continued threat of repetition of such conduct, as Defendants' scheme is their regular manner of conducting operations. This is evidenced by the fact that Defendant Expo's "Letter of Authorization" was dated January 15, 2019, and its "Provisional Lifting Right" dated April 20, 2020, both of which predate the events involving Plaintiff. The sophistication of this fraud also strongly supports its use in multiple schemes.

84. Defendants participated in the management and operation of the association-in-fact enterprise by managing, facilitating, and committing multiple acts of racketeering as described above and below.

85. The Defendants' unlawful actions proximately caused and continue to cause injuries to Plaintiff under 18 U.S.C. § 1964(c). Specifically, the Defendants' violations of these statutes resulted in Plaintiff's loss of nearly $700,000 related to payments made, as well as thousands in legal and travel expenses and millions in lost revenues. Furthermore, Plaintiff would not have entered into any transaction with Defendants if it had knowledge of the Defendants' plan to defraud.

86. Plaintiff accordingly seeks an award of three times the damages it sustained based on the amount due to Plaintiff under the applicable agreements, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized by statute.

### Count II: Violations of 18 U.S.C. § 1962(d) (Civil RICO)
### (All Defendants)

87. Plaintiff realleges paragraphs 1-86 as if set forth fully herein.

88. Each Defendant violated RICO and Plaintiff was injured as a result.

89. All Defendants violated 18 U.S.C. § 1962(d), injuring Plaintiff and giving rise to liability under 18 U.S.C. § 1964(c).

90. Under 18 U.S.C. § 1964(c):

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person who is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final.

91. 18 U.S.C. § 1962(d) provides as follows:

> It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

92. Plaintiff reasserts the claims in Count I above regarding Defendants' violations of 18 U.S.C. § 1962(c). However, at a minimum, Defendants conspired to violate 18 U.S.C. § 1962(c) and thus violated 18 U.S.C. § 1962(d).

93. The United States Supreme Court has stated that "[t]here is no requirement of some overt act or specific act" in the RICO conspiracy provision, thus making this provision "even more comprehensive than the general conspiracy offense." *See Salinas v. United States*, 522 U.S. 52, 63 (1997).

94. Additionally, "a conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Id.*

95. As set forth above, the Defendants conspired to conduct or participate, directly or indirectly, in a pattern of racketeering activity. The Defendants, together, directed the enterprise to fraudulently facilitate the payment of over $700,000 by Plaintiffs, in addition to directing other fraudulent acts meant to conceal the illegal activity, such as the creation and transmission of fraudulent documents.

96. Therefore, at a minimum, the Defendants conspired to violate 18 U.S.C. § 1962(c), and in doing so violated 18 U.S.C. § 1962(d).

## Count III: Common Law Fraud
### (All Defendants)

97. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if set forth here in full.

98. The Defendants made materially false representations to Plaintiff with the knowledge of their falsity or with reckless disregard of the truth with the intention that Plaintiff act on those representations, and Plaintiff relied on these representations to its detriment. As a proximate result of this fraud, Plaintiff sustained the damages described more fully herein.

## Count IV: Civil Conspiracy
### (All Defendants)

99. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if set forth here in full.

100. Defendants, in combination with one another, agreed to accomplish for an unlawful purpose or a lawful purpose by unlawful means, each of the violations described above, including to breach the fiduciary duties owed to Plaintiff. Defendants had a meeting of the minds on the object or course of action to divert Plaintiff's funds and property under the above causes of action. One or more of the Defendants committed an unlawful, overt act to further this object or course of action. Plaintiff has suffered a substantial injury as a proximate result of these wrongful acts.

## Count V: Respondent Superior and/or Agency Liability

101. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as if set forth here in full.

102. Each of the entities named in this Complaint is liable for the acts of its agents under the doctrine of respondent superior and/or under agency law and/or for the acts of its partners or employees.

## VI. DAMAGES

103.  Plaintiff seeks monetary relief in the following amounts, plus treble damages, attorneys' fees, and costs:

   a. $697,175.15 related to amounts paid to Defendants Expo, Ubom, and BCS Nederland in connection with various deposits and dip testing fees, as discussed further above;

   b. $56,348.00 related to travel and legal expenses incurred by Plaintiff in pursuit of information and recoupment of lost funds;

   c. $940,000.00 related to lost revenue due to Plaintiff's inability to accept other contracts because of its allocation of time and resources to this fraudulent scheme; and

   d. $180,000,000.00 related to lost revenue in connection with the fraudulent scheme itself.

104.  As a result of the foregoing causes of action, Plaintiff suffered the following damages:

- Fraudulent payment to Defendants of $697,175.15;
- Costs incurred in pursuing collection of $56,348.00;
- Direct and compensatory damages;
- Lost profits from the operation of its pre-existing business;
- Loss of Goodwill;
- Inability to engage in new business operations;
- Expenditures pursuing and/or engaging in other litigation;
- Exemplary damages.

105.  Plaintiff further specifically pleads for the remedy of piercing the veil of Expo Petroleum Oil and Gas USA, Archer Energy Corporation, and Archer Tactical Group.

106. Plaintiff further specifically pleads for the remedy of a determination that there is no limited liability for any director, owner, or other agent of Expo Petroleum Oil and Gas USA, Archer Energy Corporation, and Archer Tactical Group.

107. The conduct of the Defendants was intentional, willful, and/or grossly negligent. As such, they are liable for exemplary and/or punitive damages.

## VII. PRAYER

WHEREFORE, Plaintiff asks to be awarded a judgment against Defendants for actual damages, court costs, attorney's fees, and all other relief to which Plaintiff is entitled.

## VIII. DEMAND FOR JURY TRIAL

Plaintiff requests trial by jury.

Respectfully submitted,

Date:   January 12, 2024

By: _____
Jason B. Freeman
TX Bar No. 24069736
Jason@FreemanLaw.com

By: _____
Jason A. Hendrix
TX Bar No. 24092507
JHendrix@FreemanLaw.com

**FREEMAN LAW, PLLC**
7011 Main Street
Frisco, Texas 75034
Telephone: 214.984.3000
Fax: 214.984.3409

**ATTORNEYS FOR PLAINTIFF**